## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

THOMAS D. HORTON,      )
         )
      Plaintiff,      )
         )
vs.          )    Case No. 3:13-CV-00511-NJR-CJP
         )
CAROLYN W. COLVIN, Acting      )
Commissioner of Social Security,      )
         )
      Defendant.      )

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

In accordance with 42 U.S.C. § 405(g), Thomas D. Horton ("Plaintiff") is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security, which denied his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

### Procedural History

Plaintiff applied for DIB and SSI on July 29, 2009. In both applications, he alleged disability beginning on February 13, 2000. (Tr. 18)[1]. After holding an evidentiary hearing, Administrative Law Judge ("ALJ") Stephen M. Hanekamp denied the applications in a decision dated February 23, 2012. (Tr. 18-29). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted, and a timely complaint was filed in this district court.

---

[1] Citations to the Administrative record (Doc. 14) are designated "Tr. _".

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1.  The ALJ erred in determining his residual functional capacity ("RFC") by erroneously analyzing the record, failing to accord proper weight to treating sources, and failing to include his additional limitations.

2.  The ALJ failed to properly evaluate his credibility and address his specific testimony.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925, detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be

found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to understand that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Plaintiff was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide

questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). Nonetheless, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Hanekamp followed the five-step analytical framework described above. He determined that Plaintiff had not been engaged in substantial gainful activity since the alleged onset date. The ALJ found that Plaintiff had severe impairments of degenerative disk disease, fibromyalgia, generalized anxiety disorder, dysthymic disorder, and obsessive compulsive disorder. The ALJ further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Plaintiff had the RFC to perform work at the light level, with physical and mental limitations. Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff was able to do his past relevant work as an insurance adjuster, industrial designer, and furniture refinisher. (Tr. 29).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

1.  **Agency Forms**

Plaintiff was born in 1954; he was 45 years old at the alleged onset date. (Tr. 174).

He was insured for DIB through December 31, 2003.[3] (Tr. 174). Plaintiff completed a four

year degree in industrial design from The Ohio State University in 1976. (Tr. 39, 190,

318). He has an additional associate degree in computers that he obtained in 2000. (Tr.

40-41).

According to Plaintiff, he had a number of health problems which made him

unable to work, including fibromyalgia, degenerative disk disease, severe depression,

irritable bowel syndrome, obsessive compulsive disorder, restless leg syndrome,

migraine headaches, cholesterol, sinus and breathing problems, difficulty sleeping, and

chronic back pain. (Tr. 183).

Plaintiff owned and ran a business where he worked as an insurance and moving

claims adjuster. (Tr. 208). He also owned and ran an art and antique restoration firm,

worked as a senior project engineer for a manufacturing company, and worked as an

industrial designer. (Tr. 207).

In December 2009, Plaintiff submitted a function report in which he stated he was

able to do very little. Specifically, Plaintiff stated he had difficulty sleeping and normally

could not sleep more than two hours a night due to constant pain and headaches. He

said he also had difficulty breathing when he did lie down, and at times he did not sleep

---

[3] The date last insured is relevant to the claim for DIB, but not the claim for SSI. *See* 42 U.S.C. §§ 423(c) & 1382(a).

for two to three days in a row. Plaintiff lived alone and prepared his meals in large quantities so that he did not have to cook often. He could only cook for ten to fifteen minutes because he could not stand for longer periods. He vacuumed and did his own laundry once or twice a month. He had two dogs that he took for short ten minute walks in a park once or twice a week. He spent much of his time watching television or on the internet. He did his own grocery shopping once or twice a month. Plaintiff could only perform any movement for ten to fifteen minutes at a time and could walk only 200 yards before taking a five to ten minute rest. If he was active for more than ten or fifteen minutes it would take him two or three days to recover. He had a limited attention span and had difficulty concentrating due to lack of sleep. He had severe depression and was easily frustrated. He stated he could only sit for fifteen minutes without sharp intense pain in his back, shoulders, and neck. He reported difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, climbing stairs, with memory, completing tasks, concentrating, understanding, and using his hands. (Tr. 195-205).

### 2.  Evidentiary Hearing

Plaintiff was represented by counsel at the hearing on November 29, 2011. (Tr. 37). He testified that he had a four-year degree and an associate degree in computers. (Tr. 39-40). He was divorced and lived in an apartment alone. He had not had an income since 2000 and had sold everything to pay bills, filed for bankruptcy, and relied on his mother for loans. (Tr. 41). He drove himself to the hearing in thirty five minutes. (Tr. 42). He had previously worked as a product design manager, owned his own business as an antique conservator, handled insurance claims for moving companies, and restored and

refinished furniture. (Tr. 42-47). He testified that the last job he had involved furniture restoration and claims adjusting for a business he owned and ran. He could not remember exactly when he closed his business and testified it was in the early 2000s, somewhere between 2001 and 2003. (Tr. 48-49). He testified that the last time he performed art, furniture, or antique restoration for a client or moving damage assessment was in 2003. (Tr. 59).

Plaintiff further testified that he became disabled in February of 2000 due to a car accident. He stated he was injured in his neck from C3 through C7, and his fibromyalgia worsened as a result. (Tr. 49). He had to take medications or it felt like a knife was stabbing him in the back of his neck. He could not stand up without having sharp lower back pain problems. He testified that he went to several doctors, had x-rays and MRIs taken, participated in physical therapy, and took increased dosages of his medications. (Tr. 50). He also had steroid injections in his back and neck that caused more pain. He stated he could only stand for ten to fifteen minutes before getting dizzy and having lower back pain. He had difficulty walking. (Tr. 51). He was easily fatigued and needed several naps during the day. (Tr. 53). Plaintiff experienced these symptoms, along with depression, since his car accident in 2000. testified to having few friends and a loss of interest in activities. (Tr. 54).

Plaintiff testified that his normal day consisted of reading, watching TV, and letting his puppy outside to play. (Tr. 56). He stated he drove himself about two or three times a month and organized his trips to the bank, post office, and grocery store at once

so he did not have to drive as often. These trips lasted anywhere from fifteen minutes to three or four hours. (Tr. 57).

A VE testified that Plaintiff's past work as an industrial designer was classified as sedentary and skilled work. As Plaintiff performed this job, however, it was at the light exertional level. The VE testified that the insurance adjusting portion of the work was classified as light and at the upper end of the semi-skilled range. Plaintiff performed this job at the medium exertional level. The furniture refinishing portion of Plaintiff's job was classified as light and skilled work. Plaintiff performed this work at the light skilled level and some at the heavy work category. (Tr. 61-62).

The ALJ asked the VE several hypothetical questions that built upon one another and assumed the person had a four-year college degree in industrial design, as well as a two year associate degree in computers. The ALJ asked the VE to assume lifting and carrying of twenty pounds occasionally, ten pounds frequently, and sitting, standing, and walking a total of four out of eight hours a day. (Tr. 65). He was limited to no ladders, ropes, or scaffolds, occasionally balancing, kneeling, crouching, crawling, stopping, and climbing ramps and stairs, and he would need to change position for a minute or two every hour. (Tr. 63-64).

The VE testified that this person could perform insurance adjusting, industrial design, and furniture restoration, as these jobs are generally performed. (Tr. 68). The VE also testified that the person in all hypotheticals would not need to be able to learn any new skills but the person could not be absent more than once a month on a consistent

basis. (Tr. 60). The VE testified there would be mid-morning and mid-afternoon breaks in addition to lunch, but there would be no opportunity for naps. (Tr. 70).

### 3. Medical Treatment

Plaintiff has received treatment and medicine for fibromyalgia since the late 1980s. (Tr. 269). In February 2000, Plaintiff was in a car accident where his vehicle was hit from behind. Plaintiff did not seek immediate medical attention, but he did see his primary care physician, Dr. Cantrell, in April 2000. (Tr. 474). While Plaintiff had documented neck pain prior to the accident, Dr. Cantrell noted the neck pain increased and ordered x-rays of his spine. (Tr. 474). In April, June, and July 2000, Plaintiff's x-rays and MRI showed moderately severe degenerative disk disease at C6-7, moderate degenerative change of the C5-6 disk, central disk protrusion at C3-4 and C4-5, and narrowing on the right at C6-7. (Tr. 255-258).

Dr. Voos, an orthopedic doctor, recommended anti-inflammatory medicine and physical therapy. (Tr. 261). By September 11, 2000, Plaintiff had been to physical therapy multiple times, and Dr. Voos noted significant improvements with regard to his overall pain and ability to sleep. (Tr. 264, 267-264). In October 2000, Dr. Voos noted Plaintiff had "fewer bad days" and was sleeping much better every night. Plaintiff was instructed on the exercises to do at home and was discharged from physical therapy. (Tr. 277).

Plaintiff continued to regularly see Dr. Cantrell primarily due to neck pain, fibromyalgia, hyperlipidemia, and trouble sleeping from October 2000 until October 2004. (Tr. 453-479). In 2001, Plaintiff had three trigger point injections from Dr. Smith. (Tr. 283-290). In January 2002, Dr. Smith reported that Plaintiff said the injections

reduced his pain by more than 65%, and he discharged Plaintiff from the injections, with the instruction to continue stretching. (Tr. 281). In 2002 and 2003, Plaintiff had EMG nerve conduction studies performed, and the results were normal. (Tr. 292-306).

Plaintiff does not have any medical records from 2004 through April 2006, when he began seeing a primary care physician, Dr. Alvarado. One completed form from 2011 states that Dr. Alvarado began seeing plaintiff in 2005, however, the first treatment on record was in 2006. (Tr. 492). Plaintiff occasionally saw Dr. Alvarado from April 2006 through May 2010. (Tr. 311-16, 344-378, 444-46). Dr. Alvarado diagnosed Plaintiff with fibromyalgia, hyperlipidemia, lumbago, insomnia, obsessive compulsive disorder, cervicalgia, depression, anxiety, degenerative disk disease, upper back pain, and pain in joint on lower leg. Dr. Alvarado regularly noted spinal tenderness. At several appointments, Dr. Alvarado recommended regular exercise to help alleviate symptoms (Tr. 314, 350, 355, 360, 369, 377). Plaintiff took medications ranging from strong pain medications, such as Duragesic patches and Vicodin, to psychotropic medications, such as Cymbalta and Abilify. In total, Plaintiff was taking nine different medications prescribed by Dr. Alvarado. (Tr. 444-445).

### 4. Opinion of Dr. Alvarado

In February 2011, Dr. Alvarado completed a medical source statement. She reported first seeing Plaintiff in 2005. Her diagnosis was fibromyalgia and chronic lower back pain with a "good" prognosis. Dr. Alvarado stated Plaintiff could only sit, stand, or walk for less than two hours during an eight hour work day. She believed he would need periods of walking, need to be able to shift positions at will, and he would

sometimes need to take unscheduled fifteen minute breaks. Plaintiff could occasionally lift less than ten pounds, rarely lift ten to twenty pounds, and never lift fifty pounds. Plaintiff could rarely twist, stoop, bend, crouch, handle, finger, or feel; he could never climb ladders; he could occasionally climb stairs and reach in all directions. Dr. Alvarado noted depression, anxiety, and somatoform disorder. She believed Plaintiff's pain constantly interfered with his attention and concentration, and he had marked limitation in dealing with work stress. Dr. Alvarado believed Plaintiff would need to miss work more than three times a month due to impairments. (Tr. 492-93).

### 5.  Consultative Exam

Fred Klug, Ph.D., performed a psychological consultative examination in February 2010. Plaintiff said he had no history of mental health treatment but was currently taking psychotropic medications. On exam, he was oriented to time, place, and person. His attention span was impaired, but his concentration was good, as he was able do serial 7s without error. His fund of knowledge was adequate but not commensurate with his education. His reasoning and ability to do simple calculations was good. His abstract thinking was poor, but his judgment and insight were good. Plaintiff's intellectual functioning appeared average. Simple tests for nervous system deficits were negative. Delusions were denied, but worries, obsessions, and compulsions were reported. His affect was appropriate and consistent with his thought content. The diagnosis was generalized anxiety disorder, dysthymic disorder, and obsessive compulsive disorder on Axis I. Dr. Klug felt Plaintiff could participate in the management of his funds. (Tr. 388-92).

Dr. Adrian Feinerman performed a physical consultative exam in February 2010. Dr. Feinerman's diagnostic impression was cervical disk disease, fibromyalgia, irritable bowel syndrome, and restless leg syndrome. Plaintiff had a full range of motion of the spine, and he was able to get on and off the exam table, tandem walk, walk on his toes, walk on his heels, squat and rise, and hop on one leg without the use of an assistive device. Plaintiff was oriented to person, place, and time, and his appearance, behavior, memory and concentration were normal. Dr. Feinerman said Plaintiff was able to lift, carry, and handle objects without difficulty. (Tr. 394-401).

**6.  State Agency RFC Assessment**

Dr. Gotway, a state agency consultant, assessed Plaintiff's physical RFC in February 2010. He reviewed medical records but did not examine Plaintiff. He opined Plaintiff was able to do work at the medium exertional level, i.e., frequently lift twenty-five pounds and occasionally lift fifty pounds. (Tr. 435-442). This opinion was affirmed by an additional physician who reviewed the record. (Tr. 450-52).

**7.  Records Not Before ALJ**

After the ALJ issued his decision, Plaintiff submitted additional medical records to the Appeals Council in connection with his request for review. *See* AC Exhibits List, Tr. 5. Thus, the medical records at Tr. 494-524 designated by the Appeals Council as Exhibit 23F were not before the ALJ.

These medical records cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence. Records "submitted for the first time to the Appeals Council, though technically a part of the administrative

record, cannot be used as a basis for a finding of a reversible error." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). *See also Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 366, n. 2 (7th Cir. 2004).

### 8.   Additional Information

Plaintiff submitted a sixteen page self-typed statement as to his conditions, symptoms, and an additional document entitled "Zung Depression Scale". (Tr. 325-342).

### Analysis

Plaintiff argues first that the ALJ incorrectly determined his RFC and improperly analyzed the record by not giving the treating source's opinion more weight and by failing to consider evidence of Plaintiff's additional limitations. As Plaintiff relies in part on his own testimony, the Court will first consider his argument regarding the ALJ's credibility analysis.

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

The ALJ is required to give "specific reasons" for his credibility findings and to analyze the evidence rather than simply describe a plaintiff's testimony. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). *See also Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (The ALJ "must justify the credibility finding with specific reasons supported by the

record.") The ALJ may rely on conflicts between a plaintiff's testimony and the objective record, as "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). If the adverse credibility finding is premised on inconsistencies between a plaintiff's statements and other evidence in the record, however, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Here, Plaintiff does not take issue with any of the reasons cited by the ALJ. Rather, he argues that the ALJ's analysis was insufficient as he did not address the credibility of specific portions of his testimony, explain the basis for rejecting this testimony, or clarify how much weight he actually gave the testimony.

Contrary to Plaintiff's suggestion, "an ALJ's credibility findings need not specify which statements were not credible." *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.

It is clear ALJ Hanekamp considered the relevant factors. *See* SSR 96-7p. He thoroughly reviewed Plaintiff's medical history, analyzing all medical treatments and examinations on record. He concluded that the medical records and objective medical testing did not support Plaintiff's claim of disabling pain. For example, the ALJ discussed how x-rays and MRIs showed significant disk protrusions and degeneration. While he concluded this would cause some pain, he also noted that the EMG nerve

studies conducted were normal, with no significant abnormalities or radiculopathy. He also noted how Plaintiff had documented neck pain but was prescribed medications and physical therapy instead of surgery. The ALJ discussed how Plaintiff receives psychotropic medications from his primary care physician but has never sought psychiatric treatment. (Tr. 24-6).

The ALJ took into consideration Plaintiff's allegations of extremely limited daily activities and the objective medical evidence. Plaintiff claimed to need naps during the day, but there is no concrete medical evidence for this limitation. He reported severe limitations regarding his ability to walk, sit, stand, and sleep. Yet he took care of himself, drove, did his own grocery shopping, cooked, and took care of a 12-week old puppy. The ALJ also looked at Plaintiff's significant amount of prescribed medications, but noted all were prescribed by his primary care physician and not by specialists. The ALJ found Plaintiff's testimony regarding his work history to be inconsistent as he claimed he became disabled in 2000 but was unclear about whether he closed his business in 2001, 2002, or 2003. (Tr. 24-6).

Plaintiff points out that the ALJ used the boilerplate language that has been criticized in cases such as *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010), and *Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003). But the use of the boilerplate language does not necessarily require remand. The use of such language is harmless where the ALJ goes on to support his conclusion with reasons derived from the evidence. *See Pepper v, Colvin*, 712 F.3d 351, 367-368 (7th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 306, 310-311 (7th Cir 2012).

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). The analysis is deemed to be patently wrong "only when the ALJ's determination lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-414 (7th Cir. 2008). Here, the analysis is far from patently wrong. It is evident that ALJ Hanekamp considered the appropriate factors and built the required logical bridge from the evidence to his conclusions about Plaintiff's testimony. *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). For this reason, his credibility determination stands.

Plaintiff also argues that the ALJ erred in determining his RFC by not considering his additional limitations. His first point in support of this argument is that the opinions of Dr. Alvarado, his treating physician, were not given enough weight.

A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical evidence and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).

The version of 20 C.F.R. §404.1527(d)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature</u>

<u>and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

It must be noted that, "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (internal citation omitted). If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions. *See* 20 C.F.R. §404.1527(d).[4] In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).

Thus, the ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of a consulting physician, internally inconsistent, or inconsistent with other evidence in the record. *Henke v. Astrue*, 498 Fed.Appx. 636, 639 (7th Cir. 2012); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)**.** If the ALJ determines that a treating doctor's opinion is not entitled to controlling weight, he must apply the §404.1527(d) factors to determine what weight to give it. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Further, in light of the deferential standard of judicial review, the ALJ

---

[4] The Court cites to the version of 20 C.F.R. §§ 404.1527 that was in effect at the time of the ALJ's decision. The agency subsequently amended the regulation by removing paragraph (c) and re-designating paragraphs (d) through (f) as paragraphs (c) through (e). 77 Fed. Reg. at 10656–57 (2012).

is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

ALJ Hanekamp met and exceeded this "lax" standard. The ALJ presented a detailed review of the medical evidence and rejected Dr. Alvarado's opinion regarding less than two hours of sitting, standing or walking, needing to shift at will from sitting, standing, and walking, unscheduled breaks every five to ten minutes for fifteen minutes, rarely twisting, stopping, bending, crouching, rarely handling, fingering, and feeling, constant interference with concentration due to pain, more than three absences a month, and a marked limitation in stress.

The ALJ followed the §404.1527(d) factors and only gave Dr. Alvarado's opinion some weight. The ALJ first noted the length of treatment did not cover the entire relevant time period of Plaintiff's injuries. At times, Plaintiff's treatment history is sporadic and includes a two year gap where no treatment was sought.[5] Moreover, Dr. Alvarado was a primary care physician and not a specialist.

The ALJ then discussed how the limitations are unsupported and inconsistent with the record. He noted, in detail, how Plaintiff's objective diagnostic testing and clinical signs resulted in a lack of support for a more restrictive RFC. Plaintiff's muscle strength testing, neurological examinations, EMG nerve studies, lack of anatomical deformities, and normal ambulation were all in direct opposition to the physical

---

[5] The Court acknowledges the record shows Plaintiff was uninsured during this two year gap. Plaintiff fails to argue, however, that the reason he did not seek treatment for those two years stems from being uninsured.

limitations suggested by Dr. Alvarado.

The ALJ discussed how the mental limitations suggested by Dr. Alvarado were also not supported. The mental status examination of Plaintiff did indicate his attention span was impaired, but the impairment was not significant, as he was able to do serial 7s without error and had good concentration. While a consultative exam showed Plaintiff's immediate memory was impaired and long term memory was marginal, the ALJ gave less weight to this sign as there was no evidence of central nervous system deficit, and Plaintiff did not have difficulty with memory and concentration when he had no reason to believe his mental status was being evaluated during a different medical exam. (Tr. 26-7).

The ALJ also discussed how the medical treatment sought by Plaintiff and the medical treatment actually offered by physicians, including Dr. Alvarado, did not support more restrictive limitations. Surgery was never recommended as a course of treatment, and Dr. Alvarado had suggested twenty to thirty minutes of exercise three times a week as an option to help with Plaintiff's pain. The ALJ noted Plaintiff's claim to need naps during the day was not supported by any objective findings. (Tr. 27). Plaintiff never sought psychiatric treatment, and his psychotropic medications were prescribed by his primary care physician. Outside of Dr. Alvarado's opinion, there was no medical evidence supporting Plaintiff's claim that his depression was severe.

Additionally, the ALJ determined Plaintiff's daily activities were not consistent with Dr. Alvarado's findings. Plaintiff took care of himself, shopped for his groceries, prepared his meals, cleaned his home, and took care of a dog. The ALJ determined

Plaintiff's lengthy self-typed report submitted to the record was inconsistent with the opinion he could only rarely finger and had impaired concentration. (Tr. 26).

Plaintiff argues that the ALJ erred in not including limitations regarding sitting, standing, walking, work absences, unscheduled breaks, concentration, upper extremity use, postural limitations, sleeping, lying down, and multiple absences from work. Plaintiff points out that the VE's testimony established that repeated absences would preclude work.

Plaintiff's support for these limitations comes from his own testimony and Dr. Alvarado's opinion. As noted above, however, the ALJ determined Plaintiff was not entirely credible, and he appropriately only gave Dr. Alvarado's opinion "some weight." Plaintiff attempts to use treatment records as an indication that his opinions are consistent with Dr. Alvarado's, but the treatment records cited primarily note Plaintiff's self-described complaints. The only objective clinical findings Plaintiff cited involved x-ray and MRI imaging, which the ALJ discussed in detail.

Plaintiff then argues that the ALJ failed to properly cite medical treatment records in analyzing his RFC. As noted in *Schmidt*, "an ALJ must consider the entire record, but is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians. 496 F.3d at 845. While the ALJ did not note exactly which doctor's opinion he took for each portion of the RFC, he did summarize each treating physician's opinion and noted how much weight he gave to each. It is evident the ALJ considered the entire record.

Additionally, Plaintiff contends the Appeals Council made a legal error by failing

to account for additional medical records submitted. When deciding whether a case should be reviewed, the Social Security Administration's regulations require the Appeals Council to consider "new" and "material" evidence. Evidence is considered material when "the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. §§ 404.970(b), 416.1470(b). The Seventh Circuit has found the Appeals Council to have made legal error when they fail to consider new evidence submitted that filled in an evidentiary gap the ALJ's decision rested upon. *Farrell v. Astrue*, 692 F.3d 767, 771-73 (7th Cir. 2012). In the case at hand, however, Plaintiff's newly submitted medical records fill in no such evidentiary gap. The medical records were all completed by Dr. Alvarado and primarily reiterate her opinions submitted to the ALJ. Unlike in *Farrell*, the ALJ's opinion here was not contradicted by the newly submitted evidence. The additional records do not justify remand as they provide no evidence of a legal error made on the part of the Appeals Council.

In sum, Plaintiff's arguments are, in effect, nothing more than an invitation for this Court to reweigh the evidence. But reweighing evidence goes far beyond the Court's role. Even if reasonable minds could differ as to whether Mr. Horton is disabled, the ALJ's decision must be affirmed if it is supported by substantial evidence. The Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

<u>Conclusion</u>

After careful review of the record as a whole, the Court finds that ALJ Hanekamp committed no errors of law, and his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Thomas D. Horton's application for disability benefits is **AFFIRMED**, and this action is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:   October 3, 2014**


_s/ Nancy J. Rosenstengel_
**NANCY J. ROSENSTENGEL**
**United States District Judge**